Filed 8/26/25  In re D.B. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re D.B., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ROXANNE R.,<br><br>        Defendant and Appellant. | A172637<br><br>(San Francisco County Super. Ct. No. JD223184) |

**MEMORANDUM OPINION**

Roxanne R. (mother) appeals an order terminating her parental rights concerning her four-year-old daughter, D.B.  We reject her arguments that the juvenile court erred in declining to apply the parental benefit exception (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i); see generally *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*)), but, based on conceded error, we conditionally reverse the order for compliance with the California Indian Child Welfare Act.[1]

---

[1] We resolve this case by memorandum opinion.  (Cal. Stds. of Jud. Admin., § 8.1.)  We do not recite the factual and procedural background because our opinion is unpublished and the parties know, or should know,

1

## DISCUSSION

We incorporate by reference the factual and procedural background described in our prior opinion denying mother's petition for extraordinary relief from orders terminating her reunification services, and only state the facts necessary to dispose of this appeal. (See *Roxanne R. v. Superior Court of San Francisco County* (Sept. 20, 2024, A170877) [nonpub. opn.].)

As explained in greater detail in our prior opinion, D.B. came to the attention of the San Francisco Human Services Agency (the agency) and was removed from mother's custody in July 2022 at age 20 months, after mother ran a red light and police officers found D.B. in the backseat of mother's car with a black eye and arrested her on charges of driving under the influence of alcohol. The juvenile court sustained allegations D.B. was at serious risk of physical abuse, emotional harm and neglect risk due to a history of domestic violence between mother, then age 22, and a boyfriend, De.B. Mother had been in a long-term relationship with De.B. since she was 16, had threatened to injure her daughter as a means of antagonizing De.B., who abused mother, and had an extensive history of mental health issues and trauma. It was later determined that a man named J.D. (father) was D.B.'s biological father.

Mother received 21 months of reunification services but was unable to reunify with D.B. The juvenile court terminated her reunification services on July 5, 2024.[2]

---

"the facts of the case and its procedural history." (*People v. Garcia* (2002) 97 Cal.App.4th 847, 851 [unpublished opinion merely reviewing correctness of trial court's decision "does not merit extensive factual or legal statement"].)

[2] Mother petitioned for extraordinary relief and we denied her writ petition. (See *Roxanne R. v. Superior Court of San Francisco County* (Sept. 20, 2024, A170877) [nonpub. opn.].)

2

During the reunification period, mother had initially progressed to such an extent that the agency recommended, in September 2023, that D.B. be returned to mother's custody with family maintenance services because of D.B.'s "strong connection" with her. But within days it revoked its recommendation, and also recommended that mother's unsupervised visits be suspended, because of new, alarming information about continuing domestic violence between mother and father during one of D.B.'s overnight visits with mother, that prompted D.B. to cry and tell her caretaker she didn't want to stay with mother, blurt out the next day at daycare, "My daddy hit my mommy and he hit me too," and express that what had happened made her sad. Mother denied the incident, lied about it, and did not appear to be taking seriously its impact on D.B. After that incident, mother's visitation was changed to supervised (on October 5, 2023), her engagement with her case plan markedly decreased, D.B.'s play behaviors became more aggressive and D.B.'s sleep became disturbed.

The visitation supervisor assessed that after the September 2023 incident, D.B. needed "re-bonding" with mother. Within about four months, by late January and early February 2024, the visitation supervisor observed interactions that demonstrated a strong, comfortable, secure and loving bond between them.

But then, between approximately March and May 2024, there were many more violent incidents involving a new boyfriend. Police responded to three of them: an assault at mother's apartment involving the new boyfriend, following which mother showed up to supervised visitation with a black eye and a cut on her neck (in March 2024), another incident in April 2024 involving apparently the same person who showed up at her door pointing a gun through her peephole, and another incident in early May that left mother

3

with visible injuries. She attended supervised visitation with another black eye, police officers came to the maternal relatives' home to investigate while D.B. was there for a supervised visit, and D.B. was shaken up by seeing the police and had difficulty sleeping after that. Despite having told the agency the last such incident had been the prior September, mother confided to police there had been at least 10 more violent episodes involving her new boyfriend that she never brought to anyone's attention. He pummeled her with death threats, violent messages, physical strangulation and he broke into her home multiple times. Eventually the boyfriend was arrested, and found in possession of a loaded, semi-automatic weapon. Mother told police she had feared for her life. Yet she told the agency that one of the incidents did not involve domestic violence, denied that she was injured and attributed police involvement on that occasion to a cell phone theft.

By the time the juvenile court terminated mother's reunification services a couple of months later, in July 2024, her participation in therapy had become inconsistent and her participation in her domestic violence intervention program had been "minimal and inconsistent," with mother engaging only when told her referral would be closed. Her domestic violence counselor's assessment was that mother's patterns were not changing.

Nearly eight months later, on February 26, 2025, the juvenile court held a contested, one-day section 366.26 hearing, at which point D.B. was four years old. By then, D.B. had been living with her paternal grandfather and paternal step-grandmother for more than two years, she was thriving in their care and they wanted to adopt her. The agency reported that after mother's reunification services had been terminated, she had been arrested in September 2024 on outstanding warrants for prior criminal charges. She had continued to have supervised visitation with D.B. twice a week: every

4

Saturday for about seven hours, supervised in the home of her maternal relatives, and Tuesday afternoons for two hours, supervised by the agency.

At the contested hearing, there were only two witnesses: mother's mother, who supervised some of the visits, and the assigned social worker who had been involved with the case for about six months. Mother did not testify. At the hearing's conclusion, the court terminated mother's parental rights and selected adoption as D.B.'s permanent plan; we discuss its ruling further below. Mother then timely appealed.

The parties agree that the order terminating parental rights should be conditionally reversed because the record does not reflect that the agency complied with the California Indian Child Welfare Act by interviewing all known maternal and paternal relatives, and we will so order. (See *In re Dezi C.* (2024) 16 Cal.5th 1112, 1136.)

But for that conceded error, we perceive no error in the juvenile court's decision to terminate mother's parental rights.

We acknowledge mother's love for D.B. and that D.B. enjoyed their regular and frequent visits together. Nevertheless, mother bore the burden of proof to establish the parental benefit exception. (*In re M.V.* (2025) 109 Cal.App.5th 486, 508 (*M.V.*).) Thus, as she acknowledges, to prevail on appeal she must demonstrate that the evidence was both uncontradicted and unimpeached, and also of such a character and weight as to leave no room for the juvenile court to rule against her.[3] (*M.V.,* at p. 508.)

It was not. The evidence was not so one-sided and of such a persuasive character as to compel a finding in mother's favor on the exception's second

_____

[3] The first *Caden C.* element, regular visitation and contact, is not at issue here. The juvenile court found it was met and on appeal it is conceded.

5

element: that D.B. had a "substantial, positive, emotional attachment" to her. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Although there is evidence D.B. had a "strong connection" with mother before witnessing the September 2023 domestic violence incident during an overnight visit that traumatized her, and then slowly grew secure with mother again after that, all of those interactions preceded the volatile events of the spring of 2024 in which mother was repeatedly abused by her new boyfriend. During one supervised visitation during this later period, D.B. was subjected to seeing mother with yet more visible injuries and also encountering the police. There is evidence that D.B.'s feelings toward mother were more ambivalent after that.[4] To be sure, there is ample evidence that mother's visits went well, and that D.B. was excited to see her, enjoyed spending time with her and was sad when a visit was missed, but there also is evidence that D.B.'s attitude toward other adults was similar, and that she is an outgoing, happy, sociable child.[5] The

---

[4] Visitation logs reflect that during one visit with D.B. at her foster placement with paternal grandparents (in July 2024, a few weeks after reunification services were terminated), the social worker asked D.B. about her visits with mother and D.B. began singing, dancing and saying, "I love my mom, I love my mom." But when the social worker asked if D.B. liked spending time with her mother, D.B. became "quiet and did not answer." Her step-grandmother asked why she had become quiet and encouraged her to answer and only then did she do so, stating only that it was "good" to visit with mother.

[5] For example, the social worker testified that D.B. was excited to see mother at visits but "[s]he's excited when she sees me when I come as well. She's a very social, happy kid." He testified that in preschool, D.B. is "very social," "incredibly friendly," and has a lot of friends, and that when he has observed her at school "she's excited to introduce me or show me off to her friends." When he visited her at her grandparents' home, she "seems excited when I arrive" and "immediately" wants to show off a new toy or her dollhouse to him and begin playing with him.

court thus could infer that D.B.'s behavior during visits was more a reflection of her personality than to an emotional attachment to mother that was "substantial." (*Caden C.*, at p. 636.) In addition, the social worker testified D.B. was not upset when visits ended and never asked for more time with mother. Further, mother herself didn't testify about D.B.'s interactions during their visits, although she could have done so. The juvenile court could infer mother's testimony would not support a finding that D.B. had a strong emotional bond with her after so much time out of her care, time that was punctuated by repeated exposure to domestic violence and police intervention. (See *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1075; Evid. Code, § 412.)

In short, the evidence did not compel a finding that D.B. had a "positive, emotional attachment" to mother that was "substantial" (*Caden C.*, *supra*, 11 Cal.5th at p. 636) at the time of the section 366.26 hearing.

Likewise, the evidence did not compel a finding that the third *Caden C.* element was established. (See *M.V.*, *supra*, 109 Cal.App.5th at p. 514.) This element requires proof that " 'termination [of mother's rights] would be detrimental to the child due to' the relationship" such that "it would be harmful to the child to sever the relationship and choose adoption." (*Caden C., supra,* 11 Cal.5th at p. 633.) The question is "whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.) The juvenile court had discretion to conclude that mother did not prove this element, even assuming that she and D.B. shared a sufficiently

---

In addition, the trial court found that although D.B. looks forward to her visits with mother, she also looks forward to spending time with her maternal relatives during mother's weekly supervised visits in their home.

7

close relationship to satisfy the first element. Among other reasons, the social worker testified that in his opinion, based on his familiarity with the case, D.B. would not suffer significant harm if her relationship with mother were severed. He testified that she had lived more than half her life (more than two years) with her paternal grandparents who wanted to adopt her, and felt safe and stable there and would continue to thrive there.[6] In addition, mother's inability to overcome her pattern of engaging in relationships characterized by domestic violence placed D.B. at continued risk, at a minimum, of being exposed again to seeing mother with injuries and/or the police, and thereby being retraumatized. The juvenile court could reasonably conclude that severing ties with mother under these circumstances would not harm D.B. to such an extent that it outweighed the benefits of a permanent, adoptive home.

Nor will we reverse on the ground the juvenile court relied on improper factors in reaching its decision. The court did not, as mother contends, improperly require her to show she was D.B.'s primary caretaker, occupied a "parental" role or could meet D.B.'s everyday needs, even though it used the phrases "caretaker" and "parent" in its ruling. For example, the juvenile court stated that while D.B. looks forward to her visits with mother and "benefits greatly" from them, "I don't know that [D.B.] looks to mom as her . . . primary caretaker," a term it said it "hate[d]," and meant "that person who [D.B.] knows is going to provide the safety, going to provide for her

---

[6] Mother challenges the weight of this testimony, and asserts "there was no evidence presented by the [a]gency to suggest that D.B.'s best interests were protected through no further relationship or interaction with mother" but she bore the burden of proof to prove this exception, including on appeal to show the social worker's opinion was entitled to *no* weight.

8

needs, going to protect her, going to comfort her, going to do all of those things that a child looks to a parent to do." We do not interpret such comments as indicating the court believed mother was required to prove D.B.'s attachment to her was D.B.'s primary emotional bond, which is not the law. (See *Caden C.*, *supra*, 11 Cal.5th at p. 634 ["the section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver"]; *In re J.D.* (2021) 70 Cal.App.5th 833, 859-860 [evidence that child looked to custodial caregiver as his parent did not preclude finding he had significant positive attachment to mother].) It was proper for the court to consider whether mother was *a* source of " ' "comfort, nourishment or physical care" ' " during her weekly visits (see *Caden C.*, at p. 632) but "the quality of [D.B.'s] attachment to her must be evaluated in the context of the contact [mother] was permitted to have with [D.B.] during the course of the dependency proceeding." (*J.D.*, at p. 860.) That said, the juvenile court's explanation of what it meant by "primary caretaker" suggests it understood that the question was not whether D.B. viewed mother as the primary person to whom she looked for care as compared to D.B.'s foster parents, but rather whether the bond between D.B. and mother was sufficiently strong and positive to meet the *Caden C.* standard. Thus, the court observed that "the fact that [D.B.] does not exhibit a lack of mother's presence or respond negatively to mother's absence is I think telling about who she looks to for her primary care, and the Court, I think, can infer *that would demonstrate bonding.*" (Italics added.)

Moreover, even if ambiguous, the juvenile court's comments must be read in context of its overall ruling. Here the record reflects that the juvenile court properly understood and applied the correct legal standard. The court said it "kn[ew] that the relationship doesn't have to conform to a consistent

9

pattern," which is right. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632.) It found that D.B. was four years and four months old and had been in mother's custody for just over one year and eight months but out of mother's custody for two years and seven months, which are proper considerations. (See *ibid.*) It found that D.B. transitions easily to her grandparents after visits, which it found "significant" because at D.B.'s age "you would expect that if there was a . . . strong relationship [with mother] . . . she would react more negatively or be more needy in having time with mom, being reassured mom is going to be there, asking repeatedly, Where's mom? I want to see mom." (See *ibid.* [courts properly consider "how children feel about, interact with, look to, or talk about their parents"].) It stated D.B. "looks to mom as another loving adult in her life but doesn't look to mom as parent," impliedly finding that D.B. does not have a substantially more important or qualitatively different bond to mother than she has to other adults. And it concluded, "The Court does not believe there is such a significant, positive, emotional attachment . . . to mom that would be detrimental to her by . . . severing the parental relationship and allowing her to be adopted by adoptive parents." That was the correct legal standard. (See *Caden C.*, at p. 636.) The court's use of some imprecise language in isolation does not demonstrate error. (See, e.g, *M.V.*, *supra,* 109 Cal.App.5th at pp. 507, 516 [affirming order terminating parental rights despite juvenile court discussing whether parent occupied "parental role" because record shows court properly identified and discussed *Caden C.* factors].) Error exists "where a court merely summarily states the parent had not occupied a parental role and it cannot be determined whether the court considered proper or improper factors" (*M.V.*, at p. 515), which is not true here.

10

Furthermore, even if the court misstated the legal standard, there is no rule of automatic reversal in dependency cases when a juvenile court relies on improper legal criteria. (See *In re J.R.* (2022) 82 Cal.App.5th 526, 531.) Mother has not shown that, but for the court's reliance on an improper factor, it is reasonably probable she would have obtained a more favorable result. (See Code Civ. Proc., § 475.) That is, she has not shown that the juvenile court would have declined to terminate her parental rights had it evaluated the existence of a "substantial, positive, emotional attachment" (*Caden C.*, *supra*, 11 Cal.5th at p. 636) without regard to whether she was D.B.'s "primary" caretaker or occupied the role of D.B.'s "parent."

## DISPOSITION

The order terminating parental rights is conditionally reversed. The matter is remanded with directions to order the agency to make an adequate inquiry of all known maternal and paternal relatives about the possibility of the child's Indian ancestry and to report to the juvenile court on the results of those efforts. If the juvenile court thereafter finds the agency conducted a proper and adequate inquiry and concludes the California Indian Child Welfare Act does not apply, it shall reinstate the order terminating parental rights.

STEWART, P.J.

We concur.

RICHMAN, J.

DESAUTELS, J.

*In re D.B.* (A172637)